**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:13-cv-00281-FDW-DCK**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | |
| ) | **ORDER** |
| **$63,289.00 IN UNITED STATES CURRENCY,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**THIS MATTER** is before the Court following a bench trial held on March 25, 2014. After hearing the evidence presented at trial and reviewing both parties' Proposed Findings of Fact and Conclusions of Law (Docs. Nos. 31, 32), the Court finds (1) the United States established by a preponderance of the evidence that Defendant property, sixty-three thousand two hundred eighty-nine dollars ($63,289) in U.S. Currency, was used to facilitate the commission of illegal narcotics activity, and was proceeds traceable to transactions and exchanges for controlled substances; and (2) Claimant Brenda McClure ("Claimant") failed to satisfy her burden in proving she was an "innocent owner" of Defendant property. Accordingly, Defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6). The following constitutes the Court's findings of fact and conclusions of law.

### I. FINDINGS OF FACT

1. On December 19, 2012, Claimant Brenda Jones McClure ("Claimant"), age 65, was the sole owner of the property as the head of a household of six people; daughters Monesha McClure, age 16, and Doris McClure, age 48; grandson Marico Antwain McClure ("Rico"), age

31; and two great-grandchildren, Serena McClure, age 7, and Jain McClure, age 8; at 113 Forest Drive, Harrisburg, Cabarrus County, North Carolina. (Doc. No. 19; Tr. at 98-100, 207-08).

2. Marico McClure lived continuously at 113 Forest Drive from 2009 through March 25, 2014. (Doc. No. 19; Tr. at 183, 196).

3. On November 22, 2012, Marico McClure was convicted of Possession with the Intent to Manufacture, Sell, and Deliver Marijuana, a Felony under North Carolina law, in Brunswick County, North Carolina. (Docs. Nos. 19, 21-8). Marico McClure resided at 113 Forest Drive with Claimant and three minor children at the time of the conviction. (Doc. No. 19; Tr. at 183-84). Despite the conviction, Claimant did not evict Marico McClure from 113 Forest Drive. (Tr. at 185, 273).

4. On March 24, 2003, Marico McClure was convicted of felony possession of marijuana in Cabarrus County, North Carolina. The offense date was January 11, 2003. (Docs. Nos. 17-9, 19). On the date of the offense and of the conviction, Marico McClure was living at 113 Forest Drive. (Tr. at 105, 183, 197). Despite this conviction, Claimant did not evict Marico McClure from 113 Forest Drive. (Tr. at 272-73).

5. That 2003 conviction of Marico McClure was based on the discovery of two pounds of marijuana in the ceiling of the residence at 113 Forest Drive. (Tr. at 18-19, 186).

6. Charlotte-Mecklenburg Police Officer Chris Newman ("Officer Newman"), testified that he has known both Marico McClure and Claimant for a number of years, has been to 113 Forest Drive "numerous times," and knows Doris (Dora) McClure. (Tr. at 18-19, 21, 274-75).

7. On December 19, 2012, Claimant owned a white Lincoln Navigator (the "Navigator"), license PWT9485. (Docs. Nos. 1, 6, 19).

8. Claimant testified that all members of the Claimant's household, including Marico McClure, knew Claimant stored extra keys to the Navigator in a jewelry box in her bedroom. (Tr. at 135-36, 244).

9. Eduardo Sanchez Garcia, a person cooperating with law enforcement, testified that on or about December 17, 2012, he met Marico McClure at an International House of Pancakes where Marico showed Garcia what appeared to be cocaine. (Tr. at 63-66, 72-74). On December 19, 2012, at about nine or ten a.m., Marico McClure again met Garcia at a Hardee's restaurant. Garcia testified that the two agreed that Marico McClure would purchase two kilos of cocaine from Garcia later that day for thirty-one thousand five hundred dollars ($31,500) per kilo. (Tr. at 63-66, 72-74).

10. Between mid-day and 2:00 p.m. on December 19, 2012, City of Gastonia Police Officer Morris Elliot observed Marico McClure drive a white Lincoln Navigator up to 113 Forest Drive. When Marico McClure got out of the Navigator and entered the residence from the back, he had nothing in his hands. When he subsequently left the residence and returned to the Navigator, Officer Elliot observed Mr. McClure carrying a white plastic bag and a black suitcase-type bag. (Tr. at 57-61, 100) ("Rico lives on the back end of the house.")

11. After leaving 113 Forest Drive, Task Force Officer Lindsey Lail observed Marico McClure leave the K-mart in Concord, North Carolina with a small bag. (Tr. at 52, 55).

12. At about 1:55 p.m., Officer Newman executed a stop on the Navigator in response to law-enforcement information he had received about a drug investigation involving a white Lincoln Navigator. As he approached the vehicle "in plain view was a – like a shopping bag that had money falling out of it." (Tr. at 12-14, 21-22, 41, 76).

3

13. Officer Newman has known Marico McClure for ten years. Marico McClure greeted Officer Newman from the Navigator's driver side window by saying "Hello, Mr. Newman." Marico McClure was the only person in the Navigator. (Tr. at 20-22, 27).

14. Marico McClure gave officers permission to search the vehicle. (Tr. at 17).

15. Officers seized a total of sixty-three thousand two hundred eighty-nine dollars ($63,289) of United States currency. (Docs. Nos. 19, 21-19). The cash was in a black bag on the back seat, a white plastic bag on the front passenger seat, on the front passenger seat, and in a black jacket on the front seat. (Docs. Nos. 21-2, 21-3, 21-4, 21-5; Tr. at 14-17, 43, 52, 55).

16. Officers also seized a pellet gun, "357," still encased in a clear plastic and cardboard store display. (Doc. No. 21-6; Tr. at 17, 43).

17. The denominations of the United States currency found were: seventy-four (74) one-hundred dollar bills, nineteen (19) fifty dollar bills, two thousand seven hundred and thirty-four (2,734) twenty dollar bills, seventeen (17) ten dollar bills, fourteen (14) five dollar bills, and nineteen (19) one dollar bills. The 2,734 twenty dollar bills were $54,680 of the total $63,289. (Doc. No. 21-19; Tr. at 53-55).

18. The United States currency was bundled with rubber bands. (Docs. Nos. 21-2, 21-3, 21-4, 21-5).

19. Buncombe County Sheriff's Deputy Ray Herndon, qualified as an expert in drug interdiction and drug cash identification, testified that he had seen drug money bundled with rubber bands on over two hundred (200) occasions. He testified that "the typical denomination that he encounters in connection with narcotics investigations are 5s, 20s, and 100s. The predominant denomination being a twenty dollar bill." Concerning the quantity of twenty dollar bills, he stated that "I have never seen comparable quantities of twenty dollar bills except in

narcotics investigations." He estimated from his "training and experience" that each rubber-banded bundle of twenty dollar bills contained one thousand dollars ($1,000) and that the denominations were "very typical of the cash that a narcotics dealer would have in his possession." (Docs. Nos. 21-2, 21-3, 21-7, 21-19; Tr. at 29-37). Herndon has not been involved in the direct investigation of this case.

20. Marico McClure was subpoenaed at trial and called to the witness stand. He identified himself by name and stated that he was Claimant's grandson. Marico McClure pleaded the Fifth Amendment to a succession of questions about where he lived; whether he possessed sixty-three thousand two hundred eighty-nine dollars ($63,289) on December 19, 2012; whether he was driving Claimant's Navigator on December 19, 2012; and whether he had a job. (Tr. at 50).

21. Claimant testified she and her late husband purchased the Navigator in 1998 for forty-seven thousand dollars ($47,000). At the time of purchase, there were six people in Claimant and her husband's household, and their combined income amounted to sixty thousand dollars ($60,000). (Doc. No. 21-18; Tr. at 214, 221).

22. At the time of the trial in this case, Claimant was employed at the same business for forty years, and had her salary direct deposited into her bank account for about fifteen years. (Tr. at 97, 161, 167, 181).

23. In 2012, Claimant had an income of twenty-two thousand two hundred twenty dollars ($22,220) per year from her job at Moss Supply Company and an additional twelve thousand dollars ($12,000) per year from Social Security. (Doc. No. 21-15; Tr. at 117, 263).

24. Claimant testified she purchased two automobiles for relatives, one in 2006 or 2007 for nine thousand dollars ($9,000) and one in 2013 for fifteen thousand dollars ($15,000).

For the 2013 purchase, Claimant paid a ten thousand dollar ($10,000) down payment and one hundred ninety-eight dollars ($198) per month on a loan – which she then amended – stating a relative was reimbursing her for the payments. (Tr. at 123, 222-26). In Claimant's September 2013 Answers to United States' Interrogatories, Claimant stated she had no car payments. (Tr. at 225; Doc No. 21-15).

25. Three of the members in Claimant's household at the time were minor children and had no income. Doris McClure did not work but received twelve thousand dollars ($12,000) yearly in Social Security benefits. (Tr. at 163, 208). Claimant testified that, other than Marico McClure's contributions, she provided sole monetary support to a six-person household. (Tr. at 208-09).

26. Officer Newman testified he had never known Marico McClure to have a job. (Tr. at 26, 29). At her deposition, Claimant said that Marico McClure did only "piece work," and worked at "some restaurant." (Doc. No. 21-18; Tr. at 16-17, 202-03). In her trial testimony, Claimant stated, for the first time, that Marico McClure worked at "several jobs," at Bojangles "for a year or two," at a pizza place, at a Bob Evans restaurant, and as a custodian "for five or six years" at a church. (Tr. at 197-99).

27. At trial, when asked whether Marico McClure contributed money to the household at 113 Forest Drive, Claimant replied, "when he have it you know. I understand the point. I help him." (Tr. at 205). At trial, she was also asked; "Besides Rico's piece work, you're the only person supporting the family; right?" She replied, "yes." (Tr. at 208). At her pre-trial deposition, when asked whether Marico McClure "contribute[d] money to your household there at 113 Forest Drive," Claimant replied, "Well, he help me out. He catch the water bill . . . Maybe about 30, 40 . . . per month." (Doc. No. 21-18).

28.     Claimant testified that starting in 2005 and continuing up to and including 2012, she was saving cash, her "nest egg" or "stash," in a piano stool in her living room. Claimant kept the living room locked from the outside front door – for which she had the only key – and an interior front door. She did not explain to the other family members why the living room was always locked. She testified that she was the only person who knew about the existence and source of the cash. Prior to storing her "stash" in the piano stool, she hid cash in curtains and under carpets. At one point in her testimony, Claimant said she did not keep any record of the total amount, but at another point, she stated the total was "sixty [60] something." (Tr. at 110-13, 146, 235).

29.     Claimant testified that her "stash" came from various sources including gambling winnings, her late husband's insurance premiums, and a 401(k) account. Concerning gambling income, Claimant offered exhibits to show twenty-two thousand six hundred ninety-five dollars ($22,695) of winnings in the year 2008 at Harrah's Casino on the Cherokee Indian Reservation. To win that total amount at the Casino, she testified she wagered only one thousand dollars ($1,000). (Doc. No. 19; Tr. at 248-49).

30.     Claimant testified that she deliberately collected and preferred twenty-dollar bills and that she rubber-banded the currency. Claimant testified that she asked banks for the twenties because she gives the children lunch money in twenties. (Tr. at 177-79). She was later asked and testified "I just like to use twenties." (Tr. at 255-56).

31.     Claimant testified that she and daughter Monesha were in Florida at Disney World from December 16 until December 22, 2012. Claimant testified she paid the one thousand one hundred sixty-seven dollars and seventy-eight cent ($1,167.78) hotel bill for the Florida trip with a debit card, and the air flight round trip for both her and Monesha cost five

hundred eighteen dollars and forty cents ($518.40). (Tr. at 128, 130-31). Claimant testified that various members of her household and extended family had been "on seven cruises in a row" before 2010. The cruises cost "2,000 or 2,400 per cruise." (Tr. at 250-53).

32.     Before she left for Florida, Claimant testified she transferred her "nest egg" from her living room to her white Lincoln Navigator, for "safekeeping." (Tr. at 125-27, 133, 174, 237-38). She claimed her "kids and grandkids" could not get "into" her truck as they could get into things in the house, that they "have a passion for picking locks," and that she was worried about friends of members of her household whose "friends are not my friends" breaking into or taking property from her house. (Tr. at 133-34, 137, 240). Claimant admitted she had an extra set of keys to the Navigator, and that others in the household, including Marico McClure, knew the keys were kept in her jewelry box. (Tr. at 135, 237-38).

## II. CONCLUSIONS OF LAW

To prevail in a civil forfeiture proceeding, the Government must demonstrate by a preponderance of the evidence that the defendant property is subject to forfeiture, either as proceeds of an illegal drug transaction, or as property used to facilitate an illegal drug transaction. See 18 U.S.C. § 983(c); 21 U.S.C. § 881(a)(6). Whether the Government has met this burden is determined by a totality of the circumstances. See United States v. Thomas, 913 F.2d 1111, 1115 (4th Cir. 1990). Once the Government has met its burden, the burden then shifts to the claimant to prove the "innocent owner" affirmative defense. 18 U.S.C. § 983(d)(1). An "innocent owner" is one who either "did not know of the conduct giving rise to the forfeiture" or "upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2).

Here, as discussed below, the Court finds that the Government established by a preponderance of the evidence that Defendant property is subject to forfeiture, both as proceeds of an illegal drug transaction and as property used to facilitate an illegal drug transaction. The Court also finds Claimant failed to prove the innocent owner affirmative defense because the evidence presented established Claimant knew of the conduct giving rise to the forfeiture and failed to take reasonable steps to terminate use of the Defendant property.

### A. FACILITATION FORFEITURE

Defendant property is forfeitable because it was "facilitating" an illegal drug transaction when "there [is] a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). "At minimum, the property must have more than an incidental or fortuitous connection to criminal activity." United States v. Schifferli, 895 F.2d 987, 990 (4th Cir. 1990). Defendant property is proceeds of an illegal drug transaction, and therefore forfeitable, where the property was obtained, directly or indirectly, from the commission of an illegal transaction. See 18 U.S.C. § 981(a)(2)(A).

"Possession of a large amount of cash is strong evidence of a connection to drug activity" because the "common sense reality of everyday life is that [law-abiding citizens] do not transport large quantities of cash rubber-banded into bundles and stuffed into [shopping bags]." U.S. v. Puche-Garcia, 230 F.3d 1356 (4th Cir. Sept. 13, 2000) (unpublished decision); United States v. $242,484 in U.S. Currency, 389 F.3d 1149, 1161 (11th Cir. 2004); see also United States v. $252,300 in U.S. Currency, 484 F.3d 1271, 1275 (10th Cir. 2007); United States v. $124,700 in U.S. Currency, 458 F.3d 822 (8th Cir. 2006). While the quantity of the currency discovered is not dispositive, it is significant to proving facilitation because there are "better, safer means of transporting cash if one is not trying to hide it from authorities." United States v.

9

$242,484, 389 F.3d at 1161; see also Thomas, 913 F.2d at 1111 (accepting possession of unusually large amount of currency as circumstantial evidence of drug trafficking); United States v. $50,720 in U.S. Currency, 589 F. Supp. 2d 582 (E.D.N.C. July 26, 2008) (noting large quantity of currency in unusual and suspicious denominations and bundles supports facilitation).

The Government satisfied its burden that the U.S. currency recovered from Claimant's Navigator had much more than an incidental or fortuitous connection to criminal activity. The Government's Expert testified that the appearance and denominations of the currency discovered "was very typical of the cash that a narcotics dealer would have in his possession," and he had "never seen comparable quantities of twenty dollar bills except in narcotics investigations." Marico McClure was observed leaving 113 Forest Drive with bags very similar to the bags of currency recovered a short time later from the Navigator Mr. McClure was driving. Defendant property totaled sixty-three thousand two hundred eighty nine dollars ($63, 289), only two hundred eighty-nine dollars ($289) more than the sixty-three thousand dollar ($63,000) cocaine deal Mr. McClure allegedly entered into that morning.

Neither Claimant nor Mr. McClure could supply the Court with a legitimate explanation for the suspicious circumstances that took place December 19, 2012. Claimant contends she left the cash in the car for safekeeping, and kept it hidden in the console so no one could find it. Contrary to Claimant's story, Mr. McClure used the currency to purchase a small pellet gun police found in the Navigator, and the currency was discovered in plain view on the front and back seat. Accordingly, the Court finds the Government established by a preponderance of the evidence that Defendant property is forfeitable because it was facilitating the transaction Mr. McClure entered into that day for the purchase of cocaine.

**B. PROCEEDS FORFEITURE**

Unexplained wealth is formidable evidence of ill-gotten gains because gross expenditures that exceed verifiable income suggests the wealth was derived illegally. Thomas, 913 F.2d at 1111; U.S. v. Grandison, 783 F.2d 1152, 1156 (4th Cir. 1986) ("It is clear [given the fact that Grandison was unemployed and only recently paroled] that evidence of unexplained wealth is relevant . . . as evidence of illegal dealings and ill-gotten gains."); see also United States v. Rawle, 845 F.2d 1244 (4th Cir. 1988). Where evidence of drug trafficking is presented alongside evidence of ill-gotten gains, the unexplained wealth may be traced to illegal drug proceeds. Thomas, 913 F.2d at 1111 (noting evidence that defendant's verifiable income could not possibly account for level of wealth displayed and strong evidence defendant is a drug trafficker supported belief that wealth was traceable to illegal drug proceeds); see also U.S. v. 998 Cotton St., Forsyth Cty. N.C., No. 1:11-CV-356, 2013 WL 1192821, *14 (M.D.N.C. Mar. 22, 2013) (finding non-existent record of legitimate income or federal tax returns dispositive evidence of illegal proceeds).

The Government satisfied its burden that the currency discovered in Claimant's Navigator is illegal proceeds and therefore, forfeitable. Mr. McClure has two previous convictions for marijuana possession and distribution; one of which resulted from the discovery of marijuana in the ceiling of Claimant's home. Officer Newman testified he had never known Mr. McClure to have a job, and Claimant presented conflicting accounts stating Mr. McClure did only "piece work" but later stated he had "several jobs."

Claimant has a yearly income from her job and from social security totaling thirty-four thousand dollars ($34,000) per year but has a record of recent expenditures including cruises, gambling, and automobiles that simply cannot be properly accounted for by her modest salary. The Navigator alone cost approximately forty-seven thousand dollars ($47,000). Likewise, the

Court doubts that her total household income from legal sources is sufficient to support a six-person household.

### C. INNOCENT OWNER AFFIRMATIVE DEFENSE

The Court further finds that Claimant failed to prove the "innocent owner" affirmative defense. Based on the evidence, the Court refuses to accept Claimant's explanations. False, conflicting or implausible explanations undermine a claimant's credibility and justify any fact-finder's skepticism. Puche-Garcia, 230 F.3d at 1356 (noting explanation for large amount of currency found hidden in suitcase was inconsistent and confusing, thus supporting the inference money was drug related); United States v. $50,702, 589 F. Supp. 2d at 582 (considering false, conflicting, and implausible statements as evidence that currency was proceeds of illegal drug transactions).

Under contemporary practices and habits, it is abnormal for anyone to keep such a large amount of U.S. currency in their home. See United States v. $2500, 689 F.2d 10, 16 (2d Cir. 1982) ("[A large] quantity of cash is . . . not commonly kept in residential premises by law-abiding wage earners.") It is out of the ordinary for a person who has had her salary directly deposited into her checking account for fifteen years to keep a large amount of U.S. currency at home. It is implausible that anyone would keep a large amount of cash in a piano stool for seven years, keep the room locked at all times, yet move the large "stash" to a parked automobile that can be easily accessed by the entire household. Taken in its totality, Claimant's account is just too coincidental, outlandish, and implausible to be found credible.

Even being confronted with overwhelming evidence against her, the Claimant still contends she had no knowledge of Mr. McClure's activities. Claimant testified she was not

present in December of 2012, and again when Mr. McClure was arrested and her home was searched in 2013 yielding two pounds of marijuana in the ceiling. Claimant's story implicates willful blindness; a well-settled principle of law where knowledge of a fact may be inferred where an individual deliberately closes their eyes to what would otherwise be obvious. United States v. Campbell, 977 F.2d 854, 857 (4th Cir. 1992); see also United States v. Cogdell, 844 F.2d 179, 181 (4th Cir. 1988).

It is clear Claimant allowed Marico McClure to live at her home in her presence and the presence of minor children despite two felony drug convictions, one resulting in the discovery of two pounds of marijuana in her home. It is clear Claimant (1) took several family cruises valued between two thousand ($2,000) and twenty-four hundred dollars ($2,400) each before 2010; (2) purchased three cars for herself and family members between 1998 and 2007; (3) wagered only one thousand dollars ($1,000) to win over twenty-eight thousand dollars ($28,000) gambling in the same week; and (4) was the main source of support for a household of six. The Court finds these acts are a toleration of Marico McClure's criminal acts. There is no evidence that Claimant took even the slightest steps possible to prevent known crimes from continuing. Plaintiff's lavish spending with little or no explanation of the source of money strongly suggests that she actively spent and consumed Mr. McClure's drug proceeds and, at a minimum, was willfully blind to Mr. McClure's illegal source of income.

### III. CONCLUSION

The Court finds that the Government established by a preponderance of the evidence that Defendant property is subject to forfeiture and that Claimant failed to satisfy her burden in proving the innocent owner affirmative defense. THEREFORE, all right, title and interest in the Defendant Property $63,289.00 in United States Currency is ORDERED forfeited to Plaintiff

United States of America; AND THEREFORE, Plaintiff United States of America is ORDERED to deposit Defendant Property into the appropriate assets forfeiture fund and dispose of Defendant Property according to law; AND FINALLY, the Clerk is respectfully directed to ENTER JUDGMENT in favor of the Government in accordance with the above opinion, and subsequently CLOSE THE CASE.

      IT IS SO ORDERED.

Signed: July 1, 2014

Frank D. Whitney
Chief United States District Judge